UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EUGENE SEALS,

    Plaintiff,

vs.

Case No. 17-CV-13514

HON. GEORGE CARAM STEEH

BRIDGEPORT SPAULDING SCHOOL DISTRICT, JOHN RHINES, PAT NELSON, and ROBERT LANGE,

    Defendants.

_____/

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT [ECF DOC. 18]

Plaintiff Eugene Seals filed this race discrimination action against defendant Bridgeport-Spaulding School District ("District") under 42 U.S.C. 1983 (Count I), Title VII of the Civil Rights Act of 1964 (Count II), and the Michigan Elliot Larsen Civil Rights Act ("ELCRA") (Count III). His complaint also asserts that the District's Board of Education's ("Board") vote not to extend a new contract was retaliation for his engagement in protected activity under ELCRA (Count IV).

The matter is before the court on defendants' motion for summary judgment. The court heard oral argument on the motion on September 18,

2018. For the reasons stated below, defendants' motion for summary judgment is GRANTED.

FACTUAL BACKGROUND

In October 2016, the Bridgeport Spaulding School District's Board of Education voted unanimously to grant plaintiff Eugene Seals a one year Contracted Services Personnel Agreement ("Agreement") as Athletic Director ("AD") for the District. Plaintiff is African American. Plaintiff was previously the high school boys' basketball coach in the District, a position he continued to maintain while he was AD.[1] The Agreement provided the term of service as October 11, 2016 to June 30, 2017. Plaintiff signed the Agreement on October 10, 2016. The Agreement was also signed by acting Board President Patrick Nelson, acting Secretary Theodora Morris, and Superintendent Carol Selby.

The Agreement did not contain any language regarding renewal or extension. When plaintiff started as the AD, Al Feldman, the former AD, overlapped with him for approximately three weeks. According to Feldman, he offered to help plaintiff learn the job, even setting up three appointments

---

[1] At oral argument defendant's counsel stated that he did not believe plaintiff coached while he was AD, but plaintiff's deposition testimony is clear that he did coach while he was AD and evidence from Superintendent Carol Selby is in accord. (Seals dep., pp 23, 25; Selby email to Patrick Nelson, March 15, 2017)

at the middle school, but plaintiff did not show up for the appointments and never followed up on his offer for training. (Rehmann Investigation, p. 10) Seals agrees that Feldman offered to help him learn the job and answer any questions, but he testified there was no time for training and Feldman never followed up on his offer to help. (Seals dep., pp. 123-26) Superintendent Selby acknowledged that plaintiff was not provided any training or guidance as to his job duties and responsibilities or the District's expectations. (Selby email to Patrick Nelson, March 15, 2017)

When Feldman was AD, the District had a procedure in place for handling ticket and concession sales during the basketball season. Linda Rodrigues, secretary to the AD, described that she would prepare the bank deposit slip prior to each basketball game and give Feldman the deposit slip and a sealable deposit bag provided by First Merit Bank. Feldman gave the deposit slip and bag to the ticket salespeople. (Rehmann Investigation, p. 4) Game Manager Andrew Betka stated there were two adults assigned the task of selling tickets. At the end of each game, Betka would observe one of the individuals count the proceeds from ticket sales. The second individual also observed the count, and the two individuals had to agree with the count and compete the deposit slip which would be

placed into the sealable deposit bag. The cash amount was then written on the bag. (Rehmann Investigation, p. 7)

When plaintiff became AD, Rodrigues continued to prepare the ticket summary sheet and dated deposit slip, but she did not receive the completed summary sheet at the end of each game. Betka explained that at the direction of plaintiff, the bag was not sealed because plaintiff said he would take care of sealing the bag. The bank deposit bags remained in plaintiff's office and in March 2017, plaintiff approached Rodrigues with a plastic grocery bag which contained seven or eight unsealed First Merit bank deposit bags. (Rehmann Investigation, p. 5)

Plaintiff alleges he received disparate treatment that he perceived as racial discrimination. Specifically, plaintiff's immediate supervisor, Principal John Lagalo, harassed him daily and told him on a weekly basis that he was on the School Board's "shit list." (Seals dep., pp. 71-72) Another incident plaintiff cites as evidence of racial discrimination was when Board member/defendant Rhines told plaintiff he did not like the color of the basketball warmups because they reminded him of Saginaw High. Plaintiff took this to be a racial comment because Saginaw High School is "an all-black school". (Seals dep., pp. 111-113) Rhines denies making this statement. (Rhines dep., pp. 45-46) Plaintiff contends that he reported his

claims of discrimination to Superintendent Selby. (Seals dep., pp. 115-17) Selby remembers plaintiff coming to her with his concerns that Board members were asking him a lot of questions, but she does not remember plaintiff voicing concerns that he was treated differently because of his race. (Selby dep., p. 13)

Near the end of the basketball season, Board members became concerned with the mishandling of proceeds and the missing summary sheets. The President first raised the matter with the Superintendent, and then asked the Board's Vice-President to handle the matter. On March 20, 2017, an ad hoc committee of the Board was convened to investigate if the AD violated any District policies. The committee was made up of the Board President, Robert Lange; Personnel Committee, Dempsey Allen; and Treasurer, John Rhines. On the request of the District's legal counsel, Rehmann Group was hired on April 21, 2017 to investigate the management of funds for the 2016-2017 basketball season.

Rehmann conducted interviews of seven individuals: Linda Rodrigues, secretary to the AD; Andrew Betka, Game Manager; Gabriel Rodriguez, Dean of Students; Kevin Marshall, Coach; Al Feldman, Former AD; John Lagalo, Principal; Carol Selby, Superintendent; and Pete Basile,

CFO. Plaintiff was invited to participate in the investigation on several occasions but declined to participate.

The Rehmann investigation reviewed the summary sheets and bank transactional history, and interviewed everyone other than plaintiff who played a role in handling the concession and ticket proceeds. The investigation revealed that all proceeds appeared to be accounted for. However, the summary sheets for five basketball games were not identified. No cash deposits could be directly tied to two of those games and there was no way to confirm the accuracy of the recorded deposits made for the other three games. (Rehmann Investigation, p. 2)

The Rehmann investigation concluded on May 9, 2017. On May 15 acting Board President Robert Lange emailed plaintiff requesting that he meet with the Rehmann investigator. On May 18, plaintiff's attorney responded by letter to the District's legal counsel, informing him that plaintiff would not participate in the investigation. Plaintiff's attorney compared the investigation to a witch hunt and stated that certain Board Members appeared to have a racist agenda. The attorney cited to Mr. Rhines' statement regarding the colors of the basketball warm ups and the Board's undertaking of the Rehmann investigation to support his accusations of a racist agenda: "Furthermore, it would appear that the

board is treating Mr. Seals differently than other persons within the Bridegeport Spaulding School Community. As such, I believe that there are racist overtones and a racist agenda at work." Rehmann issued its final report on June 2, 2018, which found there was no "direct evidence that AD Seals misappropriated any gate or concession receipts." However, the report concluded that "[w]ithout any supporting documentation identifying concession receipts for each game, there is no way to confirm what was actually collected for each game."

Plaintiff's Agreement expired on June 30, 2017. At the recommendation of Superintendent Selby, plaintiff's new contract was placed on the Board's agenda for the June 26, 2017 meeting. The Board voted four to two against issuing a new contract to plaintiff. The four Board members voting against a new contract were Caucasian, while the two Board members voting for a new contract were African American. The Board members who voted against offering plaintiff a new contract explained that they did so on the advice of the District's counsel, as well as on the findings of the Rehmann investigation. Nelson testified that he voted for non-renewal because he was unsatisfied with Seals' lack of cooperation with the investigation into his handling of money. (Nelson dep., pp. 37-38) Rhines testified he relied on the Board's attorney.

(Rhines dep., p. 29) Lange stated that he relied on the Rehmann investigation and the Board's attorney. (Lange dep., p. 15)

There is some discrepancy regarding who became the AD after plaintiff's contract ended. According to Superintendent Selby, Gabe Rodriguez became the new AD. (Selby dep., pp. 21-22) The individual defendant Board members testified that some of the AD duties were shared by others already employed by the District. Gabe Rodriguez is not African American. Only one of the several individuals identified as possibly helping Rodriguez perform AD duties is African American.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986);

*see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with

"specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

## ANALYSIS

**I.   Count I Race Discrimination, 42 U.S.C. § 1983;
Count II Race Discrimination, Title VII of the Civil Rights Act; and
Count III Race Discrimination, ELCRA**

Discrimination claims brought under Section 1983 and ELCRA are analyzed under the same framework as Title VII. *Perry v. McGinnis*, 209 F.3d 597, 601-02 (6th Cir. 2000); *Ondricko v. MGM Grand Detroit, LLC.*, 689 F.3d 642, 648-49 (6th Cir. 2012). A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination. *Kline v. Tennessee Valley Auth.,* 128 F.3d 337, 348 (6th Cir.1997). Where, as here, the claim is based on circumstantial evidence,

the court employs the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04 (1973).[2]

Under *McDonnell Douglas,* the plaintiff carries the burden of establishing a *prima facie* case. *Id.* at 802. To establish a *prima facie* case of discrimination, plaintiff must show that 1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class. *See Logan,* 259 F.3d 558, 567 (6th Cir. 2001); *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992).

In this case, the parties agree that plaintiff has satisfied the first two elements, but dispute whether plaintiff has met the third and fourth elements. The adverse employment action alleged by plaintiff is that his employment relationship was not continued by defendant. Plaintiff argues

---

[2] When alleging discrimination, a plaintiff may proceed on a mixed-motive claim by demonstrating that his protected status was a motivating factor in his adverse employment action, even though other factors also motivated such action. To proceed on a mixed-motive analysis, a plaintiff must give notice of bringing such claims in the complaint or responsive pleadings. *Ondricko*, 689 F.3d at 649 (citation omitted). Plaintiff Seals has not given any notice that he is bringing a mixed-motive claim in either his amended complaint nor in his response to defendants' motion for summary judgment. Where no notice is given of a mixed-motive claim, plaintiff's claim will be analyzed as a single-motive claim, utilizing the *McDonnell Douglas* framework. *Id.*

that he had a statutory right to notice and a hearing regarding non-renewal of his contract under the Michigan Revised School Code, MCL § 380.1229, because he was an administrator under the statute. The court finds that plaintiff did not qualify as an administrator under the Michigan statute because he did not possess, nor was he seeking, an administrator's certificate. *See* MCL § 380.1536. In addition, plaintiff's Agreement was clearly a contract service agreement for a defined term of service without any provision for renewal. The absence of an administrator's certificate, along with the express terms of the Agreement, clearly support the conclusion that the parties did not intend for plaintiff to be hired as an administrator. *See also Reisman v. Regents of Wayne State Univ.*, 188 Mich. App. 526, 531 (1991)

While plaintiff did not have a statutory right to notice and a hearing, the issue of his contract renewal was still put to a Board vote. Plaintiff's contract was not renewed by a vote of four to two. An adverse employment action has been defined as "a materially adverse change in the terms and conditions of [a plaintiff's] employment." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (*White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 795 (6th Cir.2004) (en banc)). Adverse employment actions are typically marked by a "significant change in employment status,"

including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (citations omitted). While failing to renew a contract is not listed as an example in this definition of adverse employment action, plaintiff was subjected to a significant change in his employment status as a result of the Board's vote. The court finds that plaintiff suffered an adverse employment action for purposes of his prima facie case.

With regard to the fourth element, there is some dispute over who replaced plaintiff as AD. It appears that Gabe Rodriguez is the primary individual who took over the AD duties, though there is some evidence that Rodriguez shared the position with Matt Smith, John Lagalo, or possibly Kevin Marshall. Of these individuals, only Kevin Marshall is African American. To satisfy the fourth element of the prima facie case of discrimination, plaintiff must put forth some evidence that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class. The evidence supports that Gabe Rodriguez was plaintiff's primary replacement, supporting plaintiff's burden of showing he was replaced by someone outside his protected class.

The legitimate non-discriminatory reasons relied upon by defendants for their decision not to renew plaintiff as AD are: (1) plaintiff took it upon himself to change the procedure in which ticket and concession proceeds were counted and deposited; (2) summary sheets were missing; (3) reports were not submitted in an accurate, timely fashion resulting in added expense and effort for the District; (4) plaintiff failed to follow the facility rental policy; and (5) plaintiff refused to cooperate with Rehmann's investigation.

Plaintiff contends that none of the above-listed reasons were given as reasons for voting to not renew his contract when the individual Board members were deposed. Rather, defendants Nelson, Rhines and Lange each testified that they voted for non-renewal on the advice of the District's counsel or on the findings of the Rehmann investigation. Nelson testified that he voted for non-renewal because he was unsatisfied by plaintiff's lack of cooperation with the investigation into his handling of athletic department money. (Nelson dep., pp. 37-38) Rhines testified that his vote was based upon the advice of the District's counsel. (Rhines dep. p. 29) Lange testified that he relied on the results of the Rehmann investigation as well as on the advice of counsel. (Lange dep., p. 15)

While plaintiff is correct that the defendants, other than Nelson, did not articulate the specific reasons they voted not to renew plaintiff's contract, they did point generally to the conclusion of the investigation into the matter of plaintiff's role in the athletic department's handling of cash receipts. The investigation ultimately determined that plaintiff changed the procedure in which ticket and concession proceeds were counted and deposited; several summary sheets were missing; reports were not submitted in an accurate, timely fashion; plaintiff failed to follow the facility rental policy; and plaintiff refused to cooperate with the investigation. The court finds that defendants have articulated several legitimate, non-discriminatory reasons for voting not to renew plaintiff's contract.

Once a legitimate nondiscriminatory reason for non-renewal has been shown by the employer, the burden shifts to plaintiff to demonstrate that the reason was pretextual. A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). "In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key

inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

Defendants point to the fact that plaintiff's deficient performance prompted an investigation into the basketball ticket sales and concessions. After an investigation by an ad hoc committee of the Board, the District's counsel initiated the Rehmann investigation to determine whether there was any negligence or falsification in the handling of the proceeds. While the investigation revealed no direct evidence of theft, there were several missing sales reports which prevented an accurate accounting. In addition, the changes plaintiff made to the procedure of handling money and his refusal to participate in the investigation are legitimate reasons for defendants to have voted not to renew his contract.

Plaintiff attempts to establish pretext by pointing to his testimony that he was discriminated based on his race. However, plaintiff has provided no evidenced to contradict the conclusions of the Rehmann investigation, to explain his own failure to participate in the investigation or to directly address the investigator's findings regarding his handling of cash receipts and deposits. A school district's interest in safeguarding its financial resources is certainly sufficient to support the Board's decision not to renew

plaintiff's contract.  The court finds that defendants' legitimate non-discriminatory reasons for voting against renewal of plaintiff's contract are not pretext for discrimination.

For the reasons set forth above, defendants' motion for summary judgment as to Counts I, II and III is GRANTED.

**II.  Count IV, Retaliation, ELCRA**

To establish a prima facie case of retaliation under ELCRA, a plaintiff must show that: (1) he engaged in protected activity; (2) the protected activity was known by defendants; (3) the defendants took employment action adverse to plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Garg v. Macomb Co. Comm. Mental Health Svcs*, 196 Mich. App. 263, 273 (2005).  An employer is prohibited from retaliating against an employee for making a charge, filing a complaint, testifying, assisting, or participating in an investigation, proceeding, or hearing.  This is referred to as the participation clause.  An employer is also prohibited from retaliating when an employee opposes a violation of ELCRA.  This is the opposition clause.  MCL § 37.2701(a).

Plaintiff invokes the opposition clause and states that he engaged in protected activity by opposing defendants' racial discrimination when he

had his counsel write a letter to the District's counsel claiming discrimination and asking that it cease. (Amended Complaint, ¶¶ 69-71) The opposition clause does not protect all opposition activity. "Courts are required 'to balance the purpose of the Act to protect persons engaging reasonably in activities opposing ... discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.... The requirements of the job and the tolerable limits of conduct in a particular setting must be explored.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989) (citation omitted).

The discrimination identified in the May 18, 2017 letter is the comment by Mr. Rhines about not liking the warm ups purchased by plaintiff because he believed the colors of the warm ups made the players look like they were from Saginaw High. The comment attributed to Rhines as described in the letter is not an allegation that defendants engaged in an unlawful employment practice. On the surface it is a statement of disagreement about uniform choice. Giving credence to plaintiff's interpretation, the statement might be seen as a reference to the racial makeup of the Saginaw High basketball team. The letter, however, does not indicate how the alleged statement discriminated against plaintiff. An

employee may not invoke the protections of ELCRA by making a vague charge of discrimination. *See id.*, at 1313.

The other incident discussed in the letter is the contract the Board entered with Rehmann Investigations to investigate plaintiff. The letter refers to the investigation as a "defamatory witch hunt," "seeking to defame and create innuendos that Mr. Seals is guilty of some crime." In accusing the Board of taking an unauthorized action in engaging Rehmann in order to defame plaintiff, the letter takes issue with the procedures employed by the Board. The letter falls short of rising to the level of protected activity as opposition to racial discrimination.

Plaintiff fails to support a finding that he engaged in protected activity under ELCRA. For this reason, defendants' motion for summary judgment as to Count IV is GRANTED.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is GRANTED.

Dated: October 4, 2018

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on October 4, 2018, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk